2002 OK 57

**Verbon SMITH and Hazel Smith, individuals, Plaintiffs/Petitioners,**

v.

**The BAPTIST FOUNDATION OF OKLAHOMA, an Oklahoma corporation, The Baptist General Convention of the State of Oklahoma, an Oklahoma corporation, Defendants/Respondents.**

No. 97,110.

Supreme Court of Oklahoma.

June 25, 2002.

Patrick O'Hara, Jr., Blake C. Parrott, Oklahoma City, OK, for Plaintiffs/Petitioners, Verbon Smith and Hazel Smith.

Jack S. Dawson, James A. Scimeca, Andrew D. Schwartz, Oklahoma City, OK, for Defendant/Respondent, The Baptist Foundation of Oklahoma.

Stephen D. Beam, Weatherford, OK, for Defendant/Respondent, The Baptist General Convention of the State of Oklahoma.

KAUGER, J.

¶1 The issues presented are: 1) whether all the plaintiffs/petitioners', Verbon and Hazel Smith (collectively, Smiths), claims predating January 1, 1995, against the defendants/respondents, Baptist Foundation of Oklahoma (Foundation/trustee) and Baptist General Convention of the State of Oklahoma (Convention), are time barred; and 2) if timely filed, whether lost insurance premiums may be recovered as consequential damages. Although we determine that claims relating to investment strategies predating January 1, 1995, are barred by the settlor's acquiescence in the trustee's actions, the existence of material questions of fact in relation to the settlor's notice on the issue of the trustee's handling of losses associated with the sale of mineral interests precludes the entrance of summary judgment on the claim. Further, the record presented will not support an award for lost insurance premiums as consequential damages.[1]

## FACTS

¶2 The Foundation is an agency of the Convention. It receives, invests and manages endowment gifts distributing the income from those gifts to Baptist causes and other designated beneficiaries.[2] In 1984, the Foundation contacted Verbon Smith (Verbon) about creating a charitable trust. Ver-

---

1. We need not determine whether, under different circumstances, lost premiums might qualify as consequential damages. Nevertheless, we note that consequential damages for breach of trust have been determined recoverable in extant jurisprudence. See, *City of Dubuque v. Iowa Trust*, 519 N.W.2d 786, 788–89 (Iowa 1994) [A trust provision holding trust advisors and consultants liable to trust participants for gross negligence and reckless disregard of duties suggests that consequential damages stemming from lack of access to trust funds may be recovered.].

2. Deposition of Robert L. Ross taken on January 15, 1999, providing in pertinent part at pp. 21–22:
 "... Q. As an agency of the Convention, what does The Baptist Foundation do?
 A. As an agency of the Convention, The Baptist Foundation receives, invests, manages endowment gifts and distributes the income from

bon conveyed real estate valued at $494,154.00 and mineral interests sold for $94,132.00 to the Foundation, forming the Verbon Smith Charitable Remainder Unitrust (trust) on June 19, 1984. The trust provided that Verbon receive up to eight percent of the trust's income during his lifetime. At Verbon's death, his wife, Hazel Smith (Hazel), was entitled to five percent of the income.[3] Upon both the Smiths' deaths, the remainder was to be distributed to the Convention.

¶3 Verbon became incompetent in 1994 after suffering a stroke. Hazel filed suit on his behalf in February of 1997, seeking to have the trust declared void *ab initio*. In addition, Hazel asserted claims for breach of fiduciary duty, negligence, removal of the trustee and an accounting. Hazel sought no damages on her own behalf—seeking to recover only in Verbon's name. Sometime subsequent to the suit's filing, Hazel became incompetent and her granddaughter, Cheryl Kerr, was appointed as guardian *ad litem*. Finding that the Foundation lacked the authority to serve as a trustee when the trust was established, the trial court sustained summary judgment in favor of Verbon and ordered the trustee to return approximately $500,000.00 to the Smiths as the trust corpus. The Court of Civil Appeals reversed and remanded in *Smith v. Baptist Foundation of Oklahoma (Smith I )*, 2000 OK CIV APP 119, 17 P.3d 466, holding that: 1) the action "arose", for venue purposes, in the county in which Verbon entered into the trust agree-

ment; and 2) a nonprofit corporation did not lack statutory authority in 1984, when the trust was created, to serve as trustee for an *inter vivos* charitable trust. The Court of Civil Appeals did not address Verbon's other theories of recovery.

¶4 The trustee and the Convention filed motions for summary judgment on April 2, 2001, alleging that Verbon's claims were barred statutorily and by the equitable doctrine of laches. The trial court heard the matter on April 26, 2001. On November 5, 2001, it entered an order sustaining the motion as to all damages occurring before January 1, 1995. Essentially, the trial court determined that until that date, Verbon had acquiesced in the trustee's management of the trust estate. Further, the trial court found that no grounds were established for the recovery of premiums paid on certain life insurance policies purchased in conjunction with the establishment of the trust. Recognizing that barring these claims affected a substantial portion of the suit, the trial court certified the cause for immediate interlocutory appeal pursuant to 12 O.S.2001 § 952(b)(3).[4]

¶5 On January 14, 2002, we granted certiorari and ordered the preparation of the record and submission of briefs. The briefing cycle was completed with the filing of Verbon's reply brief on March 13, 2002.[5] Although the notice of completion was filed on January 29, 2002, the record was not received from the trial court until March 29, 2002.

those gifts to Baptist causes and others that may be designated by donors...."

3. The suit is brought solely in Verbon's behalf with Hazel seeking no damages. Therefore, the plaintiffs/appellants are referred to individually except to the extent that the context requires the couple to be referred to collectively as "the Smiths." At this time, both Verbon and Hazel are incompetent. Hazel's granddaughter, Cheryl Kerr, has been appointed as guardian *ad litem* for the couple.

4. Title 12 O.S.2001 § 952 provides in pertinent part:
 "... (b) The Supreme Court may reverse, vacate or modify any of the following orders of the district court, or a judge thereof:
 ... (3) Any other order, which affects a substantial part of the merits of the controversy when the trial judge certifies that an immediate appeal may materially advance the ultimate

termination of the litigation; provided, however, that the Supreme Court, in its discretion may refuse to hear the appeal. If the Supreme Court assumes jurisdiction of the appeal, it shall indicate in its order whether the action in the trial court shall be stayed or shall continue...."

5. On March 13, 2002, the Smiths filed a motion to strike the Foundation's and the Convention's answer briefs as untimely asserting that they had been filed in excess of the ten-day time limitation of Rule 1.55, Oklahoma Supreme Court Rule, 12 O.S.2001, Ch. 15, App. Title 12 O.S.2001 § 2006(A) provides in pertinent part:
 "A. COMPUTATION. 1. In computing any period of time prescribed or allowed by this title, by the rules of any court of this state, or by order of a court of this state, the day of the act, event, or default from which the designated period of time begins to run shall not be in-

## I.

¶ 6 VERBON'S KNOWLEDGE THAT POOLED INVESTMENTS WERE BEING UTILIZED BY THE TRUSTEE COUPLED WITH INFORMATION PROVIDED INDICATING THE RETURNS ON THE INVESTMENTS PRECLUDES VERBON FROM PURSUING CLAIMS DURING THE PERIOD IN WHICH VERBON, THROUGH SILENCE, ACQUIESCED IN THE INVESTMENT PROCEDURES UTILIZED.

a. Defenses to allegations of fraud or breach of trust—statute of limitations, laches and acquiescence.

¶ 7 Relying on general statements in early case law,[6] Verbon's guardian asserts that

Verbon's claims—arising from a fiduciary relationship—can never be affected by the expiration of a limitations period because the trust has not been terminated and there has been no repudiation.[7] Similar arguments were considered and rejected in *Mud Trans, Inc. v. Foster–Dickenson & Co., Inc.*, 1993 OK 94, 856 P.2d 282, which makes it clear that the statute of limitations begins to run on a trust beneficiary's claim when it learns it has suffered damage that might be the trustee's fault.[8]

¶ 8 At the time this cause was filed, actions grounded in allegations of fraud or breach of trust were governed by the two-year statute of limitations found in 12 O.S. Supp.1996 § 95(3).[9] The discovery rule allows the limitation period in certain tort cases to be tolled until the fraud is discovered or until the date the defrauded party, by

cluded.... [W]hen the period of time prescribed or allowed is less than eleven (11) days, intermediate legal holidays and any other day when the office of the court clerk does not remain open for public business until the regularly scheduled closing time, shall be excluded from the computation...."
The Oklahoma Comment to § 2006 provides:
"The proposed change extends a ten day deadline from ten calendar days to two weeks to allow a party a full ten working days to meet a ten day deadline. The same change was made to Fed.R.Civ.P. 6, the federal counterpart of 12 O.S. Supp.1997 § 2006, in 1985."
The Smiths' brief in chief was filed on February 20, 2002. When the rule for computation set forth in 12 O.S.2001 § 2001(A)(1), this note, supra, is applied to the computation for determining the outtermost date for the filing of the respective answer briefs, both the Convention's brief, filed on March 5, 2002, and the Foundation's brief, filed on March 6, 2002, are timely. *K.J. Constr. v. Puente*, 2000 OK CIV APP 138, ¶ 3, 16 P.3d 481. The Smiths appear to have followed the computation equation set forth in 12 O.S. § 2001(A)(1), this note supra, in filing their reply brief which was submitted five working days, and seven calendar days, after the response briefs were filed.

6. *Harrison v. Eaves*, 1942 OK 339, ¶ 0, 130 P.2d 841; *Ludey v. Pure Oil Co.*, see note 7, infra; *Hivick v. Hemme*, 1926 OK 247, ¶ 7, 247 P. 692.

7. See, *Ludey v. Pure Oil Co.*, 1931 OK 527, ¶ 16, 11 P.2d 102 [Where a trust or fiduciary relationship exists, the statute of limitations does not begin to run until the termination of that relationship.]; *Becker v. State*, 1957 OK 102, ¶ 0, 312 P.2d 935 [Statute of limitations do not begin to

run in favor of trustee until the trustee clearly repudiates the trust and the repudiation is brought to the attention of the *cestui que* trust.]. See also, *Catron v. First Nat'l Bank & Trust Co. of Tulsa*, 1967 OK 107, ¶ 31, 434 P.2d 263 [In order to set statute of limitations in motion on constructive trust, clear repudiation of trust must occur and beneficiary must be aware of repudiation.].

8. See also, *Kinzy v. State ex rel. Oklahoma Firefighters Pension & Retirement System*, 2001 OK 24, ¶ 6, 20 P.3d 818; *Dotson v. Rainbolt*, 1995 OK 39, ¶ 2, 894 P.2d 1109.

9. *Resolution Trust Corp. v. Greer*, 1995 OK 126, ¶ 15, 911 P.2d 257; *Mud Trans v. Foster–Dickenson & Co.*, see note 11, infra; 12 O.S. Supp.1996 § 95(3) providing in pertinent part:
"Civil actions other than for the recovery of real property can only be brought within the following periods, after the cause of action shall have accrued, and not afterwards:
... 3. Within two (2) years: ... an action for relief on the ground of fraud—the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud ..."
Title 60 O.S.2001 § 175.57 was enacted effective June 10, 1999. The statute contains a specific limitations period for causes of action associated with breach of trust claims. It provides in pertinent part:
"... E. 1. Unless previously barred by adjudication, consent, or other limitation, a claim against a trustee for breach of trust is barred as to a beneficiary who has received from the trustee a report or other statement adequately disclosing the existence of the claim unless:

the exercise of ordinary diligence, might have recognized the deception.[10] Even where the defendant has the responsibility of a trustee towards the plaintiff, the statute starts to run when the beneficiary learns it has suffered damage that might be the trustee's fault.[11] The question of when fraud is discovered or should have been unearthed with the exercise of ordinary diligence is one of fact dependent on the surrounding circumstances, the relationship of the parties, and all other elements peculiar to the cause.[12]

> a. a judicial proceeding to assert the claim is commenced within two (2) years after receipt of the report or statement or, if no report or statement is received, within two (2) years after the termination of the trust relationship between the beneficiary and that particular trustee, and
> b. The report or other statement informs the beneficiary of this time limitation.
> A report or statement adequately discloses the existence of a claim if it provides sufficient information so that the beneficiary knows of the claim or reasonably should have inquired into its existence. A claim thus barred does not include an action to recover for fraud or misrepresentation related to the report or other statement...."

Statutes of limitation are generally considered procedural in nature and may be applied retroactively. *Trinity Broadcasting Corp. v. Leeco Oil Co.*, 1984 OK 80, ¶ 8, 692 P.2d 1364; *House of Norvelle v. Queen Ins. Co. of America*, 1961 OK 249, ¶ 0, 365 P.2d 977; *Sheffel v. Cities Serv. Oil Co.*, 1950 OK 234, ¶ 0, 222 P.2d 1024; *Clark v. Keith*, 1924 OK ——, ¶ ——, 229 P. 613. Nevertheless, § 175.57's inclusion of the requirement that a statement denominating the limitations period in the report to the beneficiary adds a substantive requirement not previously existing in the statutory scheme. See, *Noggle v. Bank of America*, 70 Cal.App.4th 853, 82 Cal.Rptr.2d 829, 833 (1999), *rehearing denied* (1999), *review denied* (1999) [New statutory requirements for written advisory statement applied retroactively where it did not result in a change in prior law.].

We note that the Court of Civil Appeals determined in *Atwood v. Atwood*, 2001 OK CIV APP 48, ¶ 25, 25 P.3d 936 that the portion of the statute authorizing the imposition of attorney fees was procedural and applied retroactively. *Atwood* was released for publication by order of the Court of Civil Appeals, is persuasive only, and lacks precedential effect. Rule 1.200, Supreme Court Rules, 12 O.S.2001, Ch. 15, App. 1. Nevertheless, we note that the appellate court's determination was based, in part, on our decision in *Qualls v. Farmers Ins. Co.*, 1981 OK 61, ¶ 0, 629 P.2d 1258 determining that a statute relating to the award of attorney fees was proce-

 ¶ 9 Laches is an equitable defense to stale claims.[13] There is no arbitrary rule for when a claim becomes stale or what delay is excusable.[14] Application of the doctrine is discretionary depending on the facts and circumstances of each case as justice requires.[15] As an affirmative defense, the party claiming the doctrine's benefit has the burden of proof.[16] The party invoking the laches defense must show unreasonable delay coupled with knowledge of the relevant facts resulting in prejudice.[17] Delay is deemed excusable if it is induced or contributed to by the

dural and was to be given retrospective application.

10. *Digital Design Group, Inc. v. Information Builders, Inc.*, 2001 OK 21, ¶ 17, 24 P.3d 834; *Samuel Roberts Noble Found., Inc. v. Vick*, 1992 OK 140, ¶ 22, 840 P.2d 619; *Reynolds v. Porter*, 1988 OK 88, ¶ 6, 760 P.2d 816.

11. *Dotson v. Rainbolt*, 1995 OK 39, ¶ 22, 894 P.2d 1109; *Mud Trans, Inc. v. Foster–Dickenson & Co.*, 1993 OK 94, ¶ 18, 856 P.2d 282.

12. *Holmes v. McKey*, 1962 ok 278, ¶ 0, 383 P.2d 655; *American Nat'l Bank of Enid v. Crews*, 1942 OK 182, ¶ 0, 126 P.2d 733.

13. *Sooner Federal Savings & Loan Ass'n v. Smoot*, 1995 OK 31, ¶ 21, 894 P.2d 1082; *Olansen v. Texaco, Inc.*, 1978 OK 139, ¶ 34, 587 P.2d 976.

14. *Phelan v. Roberts*, 1938 OK 139, ¶ 14, 77 P.2d 9; *Nickel v. Janda*, 1923 OK 944, ¶ 0, 242 P. 264; *Harn v. Smith*, 1921 OK 328, ¶ 38, 204 P. 642.

15. *Olansen v. Texaco, Inc.*, see note 13, supra; *Marshall v. Amos*, 1968 OK 86, ¶ 0, 442 P.2d 500; *Crumley v. Smith*, 1964 OK 218, ¶ 0, 397 P.2d 119. It is this sense of fairness that will, under appropriate circumstances, support application of the doctrine in favor of the trustee at the expense of the beneficiary—the doctrine is based on the view that it is inequitable to permit the beneficiary to surcharge the trustee when a review of the surrounding circumstances indicates that the beneficiary has unreasonably delayed the prosecution of the claim. D. Baker, "Defending the Fiduciary," 2001 Handbook—Ill. CLE, 54.

16. *Sooner Federal Savings & Loan Ass'n v. Smoot*, see note 13, supra; *Nadel v. Zeligson*, 1952 OK 278, ¶ 17, 252 P.2d 140.

17. *Clark v. Unknown Heirs*, 1989 OK 145, ¶ 4, 782 P.2d 1384; *Phelan v. Roberts*, see note 14, supra.

adverse party.[18] Furthermore, laches is not a defense to one lacking notice of a right to proceed or a cause of action [19]—the elements of laches are simply not met when there is an absence of knowledge and affirmative acts to mislead.[20]

¶ 10 Acquiescence involves a quiet submission or compliance with acts from which assent can reasonably be inferred.[21] A person may, through long acquiescence in a practice or recognition of a right, be precluded from denying the legality of the actions taken.[22] Equity will not deprive a party of a remedy unless it appears the party had knowledge—one cannot acquiesce in performance of an act of which the party is ignorant.[23] Nevertheless, a beneficiary of a trust estate may be estopped from asserting a claim as against a trustee if the beneficiary accedes to the trustee's actions for an extended period of time.[24] Under appropriate circumstances, acquiescence will support the equitable plea of laches.[25]

### b. Application of the defenses to facts surrounding the utilization of pooled investments.

¶ 11 Verbon's guardian contends that throughout the management of the trust, the trustee breached its fiduciary duties and negligently mismanaged the trust by engaging in self-dealing transactions, charging and collecting excessive fees, ignoring and/or neglecting the Smiths' individualized circumstances when making investment decisions and engaging in an impermissible conflict of interest between the Smiths and the Convention. Specifically, Verbon's guardian asserts that, only when suit was filed, did the Foundation provide her with information that would have alerted Verbon to the trustee's actions forming the basis of his claims. Verbon's guardian argues that material issues of fact exist as to whether Verbon had information sufficient to put him on notice that the trust monies had been invested in generic pooled investment funds [26] and that the Foundation's losses on the sale of mineral interests had been charged back to the estate.

¶ 12 The trustee insists that claims regarding its investment strategies, i.e. the utilization of pooled investments, are barred by the settlor's long acquiescence in the investment procedures. We agree with this proposition. Nevertheless, we are convinced that a material fact issue exists concerning when Verbon was presented with documents which may

---

18. *Walker v. Oak Cliff Volunteer Fire Protection Dist.*, 1990 OK 31, ¶ 15, 807 P.2d 762; *Nadel v. Zeligson*, see note 16, supra.

19. *Chisholm v. House*, 183 F.2d 698, 705–06 (10th Cir.1950); *Lawson v. Haynes*, 170 F.2d 741, 744 (10th Cir.1948); *Walker v. Oak Cliff Volunteer Fire Protection Dist*, see note 18, supra; *Phelan v. Roberts*, see note 14, supra.

20. *Clark v. Unknown Heirs*, see note 17, supra.

21. *Lewis v. Smith*, 1940 OK 276, ¶ 12, 103 P.2d 512.

22. See, *Independent School Dist. No. I–2 of Stephens County v. Independent School Dist. No. I–23 of Jefferson County*, 1976 OK 104, ¶ 21, 553 P.2d 150.

23. *Phelan v. Roberts*, see note 14, supra.

24. *Canning v. Bennett*, 1952 OK 191, ¶ 0, 245 P.2d 1149.

25. *Independent School Dist. No. I–2 of Stephens County v. Independent School Dist. No. I–23 of Jefferson County*, see note 22, supra; *Thomas v. United Royalty Co.*, 1937 OK 183, ¶ 0, 68 P.2d

490; *Ammann v. Foster*, 1937 OK 4, ¶ 22, 64 P.2d 653.

26. Pooled investment accounts or funds put individual small investors together with others to leverage their funds so that they can participate in investment opportunities generally unavailable to the individual small investor. See, *Securities & Exchange Comm'n v. Banner Fund International*, 211 F.3d 602, 614 (C.A.D.C. 2000); *Matz v. Department of Treasury*, 155 Mich.App. 778, 401 N.W.2d 62, 64 (1986). Pooled assets are normally placed in mutual funds or other regulated investments. See, *In re Estate of Brock*, 420 Pa. 454, 218 A.2d 281, 284–85 (1966).

The settlor asserts that although the utilization of pooled investments may have been appropriate, the specific pooled investments utilized were not selected with his needs in mind. However, just as the settlor received statements showing the utilization of asset pools, he also possessed disbursements from the trustee. The two together—notice of utilization of pooled investments and the resulting income—alerted him both of the nature of investments utilized and the result of making those investments, i.e. the resulting income.

have advised him that losses associated with the trustee's sale of mineral interests were charged back to the trust.[27]

¶ 13 The trust was established in 1984. The record demonstrates that as early as October 27th, 1987, Verbon was receiving quarterly activity reports from the trustee clearly denominating income as arising from pooled investments.[28] It does not appear that Verbon inquired into the nature of these investments before he became incompetent due to a stroke in 1994. Although Hazel questioned the dropping income, the record does not denominate the date of the inquiry.[29] The earliest that it can be established from the summary judgment record that inquiries or complaints were made about investment returns from the trust is July of 1994.[30] Therefore, for a period of at least ten years—during which Verbon was competent except for a few months at the end of the time frame, no complaints were voiced about the trust's income production. For at least seven years, Verbon was receiving statements on the trust account indicating that income was being generated from the utilization of investment pools.

¶ 14 Verbon's cause of action against the trustee accrued when he had sufficient information to realize that the investment strategies utilized were not meeting his expectations.[31] Parties refraining from the pursuit of inquiries plainly suggested by the facts may not benefit from a rule tolling the applicable statute of limitations.[32]

27. The trustee relies on an exculpatory clause in the trust agreement for the proposition that it is not subject to liability for any action which might have arisen from negligence. The trust agreement provides in pertinent part at p. 5:

> "... 6.2 *Discretion of Trustee.* The Trustee shall use its best judgment in exercising the powers, discretion and rights conferred by this Agreement, and in performing its duties as Trustee which are imposed upon it by law, and, in order to feel free in doing so, the Trustee shall be exempt from liability for any action taken or omitted in good faith...."

Nevertheless, the argument that the clause bars all liability is unconvincing. The same trust agreement contains a provision prohibiting the trustee from engaging in self-dealing. It provides in pertinent part at pp. 7–8:

> "... 8.1 ... [T]he Trustee shall not:
> ... (2) Engage in any act of self-dealing ..."

28. Defendants exhibit 2 is a letter from the trustee to Verbon dated October 27, 1987. It provides in pertinent part:

> "... Please find enclosed a report of the activity and status of your trust with the Baptist Foundation of Oklahoma, as of September 30, 1987. In the future you may expect to receive a similiar [sic] report on your trust after the end of each quarter...."

The report attached to the letter indicates that income of $26,169.52 was received from "pooled investments."

29. A portion of Hazel Smith's deposition is attached to the Smiths' response to the trustee's motion for summary judgment. The deposition was taken on July 24, 1997, and provides in pertinent part at p. 57:

> "... Q. Okay. Now, my question was did Verbon Smith ever call anybody at the Foundation and talk to them?

A. No, he didn't. I don't imagine he did. I don't know. I better just say I don't know ...";

and at p. 11:

> "... A. And they just kept dropping, dropping, dropping, and I felt like the Baptist Foundation was doing real good, you know, but they just—and I don't know why. I don't know why that—like that and it shouldn't have been. It shouldn't have been, and we trusted them. We just trusted them, you know, and my husband and I, we didn't want to do anything, and we waited until the last minute it seemed like and we felt like we had to have some help...."

30. A letter from the trustee to the Smiths dated July 27th indicates that it is in response to inquiries about the handling of the mineral interests and problems associated with the low production of income from the cash investments. Defendant's exhibit # 1 is a letter from Celinda K. Oszewski to the Smiths dated July 27, 1994, providing in pertinent part:

> "... As I indicated last week, the mineral interests originally contributed to the above-referenced unitrust were sold in 1984 as indicated in the correspondence to you dated October 18 and November 9, 1984, copies of which are enclosed for your records....
> We fully understand the problems associated with the low production of income from the cash investments within this account of late...."

31. *Mud Trans, Inc. v. Foster–Dickenson & Co., Inc.*, see note 11, supra. See also, *Kinzy v. State ex rel. Oklahoma Firefighters Pension & Retirement System*, see note 8, supra; *Dotson v. Rainbolt*, see note 8, supra.

32. *Kinzy v. State ex rel. Oklahoma Firefighters Pension & Retirement System*, see note 8, supra.

Therefore, we determine that Verbon's knowledge that pooled investments were being utilized by the trustee coupled with information provided indicating the returns on the investments precludes Verbon from pursuing claims during the period in which he, through silence, acquiesced in the investment procedures utilized. Any claim for damages relating to the utilization of pooled assets resulting in reduced trust income predating January 1, 1995, is barred.[33]

## II.

¶15 MATERIAL ISSUES OF FACT EXIST CONCERNING WHEN VERBON WAS PROVIDED WITH A TAX RETURN WHICH MAY HAVE ALERTED HIM THAT THE TRUSTEE WAS CHARGING THE ESTATE WITH LOSSES ASSOCIATED WITH THE SALE OF MINERAL INTERESTS AND WHETHER, WHEN PROVIDED, THE RETURN WOULD HAVE ADVISED HIM OF THE NATURE OF THE TRANSACTION RESULTING IN THE LOSS, PRECLUDING SUMMARY JUDGMENT ON THESE ISSUES.

¶16 Title 60 O.S.2001 § 175.11 has been a part of Oklahoma's statutory law on uses and trusts since 1941.[34] It provides in clear and mandatory language that no trustee shall buy trust property for itself or an affiliate.[35] Further, the trust instrument itself prohibits self-dealing transactions.[36] Nevertheless, the trustee's motion for summary judgment makes it clear that it engaged in a statutorily prohibited act of self-dealing in order to provide some immediate income to Verbon through the purchase of his mineral interests at $200.00 per acre for a total of $94,132.00.[37]

---

Even if the settlor's claims were not barred by the doctrine of laches through acquiescence, it appears that the settlor had sufficient information to put him on notice of his injury and that the two year statute of limitations would have run on a substantial portion of the claimed losses before the cause was filed in February of 1997. Title 12 O.S. Supp.1996 § 95(3), see note 9, supra. Further, with reports indicating that pooled investments were being utilized as early as 1987, the settlor's cause was filed well outside the longest possible statutory bar of five years. *Resolution Trust Corp. v. Greer*, see note 9, supra. Title 12 O.S.2001 § 95(10) provides:

"An action for relief, not hereinbefore provided for, can only be brought within five (5) years after the cause of action shall have accrued."

33. The trustee agrees with the trial court's finding that the defining period for barring claims due to the settlor's acquiescence in the investment strategies is January 1, 1995. The trustee's answer brief, filed on March 6, 2002, provides in pertinent part at p. 14:

"... Verbon Smith knew for years that The Baptist Foundation was putting his trust assets in 'pooled investments.' Even if that was not a proper investment (a point which The Baptist Foundation does not concede and which Petitioner did not prove), Verbon had approved those investments—he acquiesced. So, it was reasonable for The Baptist Foundation to assume that it could continue to manage the Trust assets the same way. There is no error in the trial court's decision that any claims for damages accruing before 1995 are barred by acquiescence...."

Admissions in the brief may be regarded as a supplement to the appellate record. *Keating v.*

*Edmondson*, 2001 OK 110, ¶9, 37 P.3d 882; *World Publishing Co. v. White*, 2001 OK 48, ¶19, 32 P.3d 835; *Oklahoma Urban Renewal Auth. v. Medical Technology & Research Auth. of Oklahoma*, 2000 OK 23, ¶14, 4 P.3d 677.

34. Title 60 O.S.2001 § 175.11 provides:

"No trustee shall directly or indirectly buy or sell any property for the trust from or to itself or an affiliate; or from or to a director, officer or employee of such trustee or of an affiliate; or from or to himself, a relative, employer, partner, or other business associate; provided a national banking association or a state bank and trust company performing trust functions, where acting as executor, administrator, guardian, or trustee, may sell stock of itself to one or more of its officers, stockholders, or directors upon a court of competent jurisdiction finding that such sale will be for the best interest of the trust estate and making an order for such sale."

35. The use of "shall" generally signifies a legislative command. *Davis v. GHS Health Maintenance*, 22 P.3d 1204, 2001 OK 3, ¶9; *United States through Farmers Home Admin. v. Hobbs*, 1996 OK 77, ¶7, 921 P.2d 338; *State ex rel. Macy v. Freeman*, 1991 OK 59, ¶8, 814 P.2d 147. Nevertheless, the term can be permissive. *Minie v. Hudson*, 1997 OK 26, ¶7, 934 P.2d 1082; *Texaco, Inc. v. City of Oklahoma City*, 1980 OK 169, ¶9, 619 P.2d 869.

36. See note, 27, supra.

37. The trustees motion for summary judgment and brief in support, filed on April 2, 2001, provides in pertinent part at p. 1:

When it later sold some of the same mineral interests for $100.00 per acre, the trustee does not deny that it charged back a loss of $23,391.47—not to the Foundation as owner of the properties, but to the trust estate.

¶ 17 The trustee argues that any claims associated with the sale of the mineral interests are barred by the statute of limitations or by the equitable doctrine of laches. It bases its argument on the fact that a 1984 tax return revealed the transaction to Verbon. Verbon's guardian asserts that there is no evidence in the record supporting the Foundation's contention that the 1984 tax return was actually provided to Verbon when it was filed and that, even if it were, it would not have advised him of the self-dealing transaction or that losses associated with the mineral interests were being charged back to the trust estate. We agree.

■■■■ ¶ 18 Where a trustee mishandles the subject matter of a trust or where the actions taken by the trustee are self-concealing, a cause of action will not accrue until the trustee-instituted actions are discovered or until they could have been unearthed by the exercise of due diligence.[38] The Foundation cannot rely on the statute of limitations defense absent a showing that Verbon knew of the breach of trust—self-dealing and charging back of losses—when it occurred[39] or was given sufficient information that he should have discovered the injury.[40] Laches is no defense to a beneficiary who is justifiably ignorant of the trustees' default or where the default has been concealed.[41] The

question of when a beneficiary discovers or with reasonable diligence could have discovered a breach of trust is a question of fact to be determined from the parties' relationship, the nature of the acts involved, and all other circumstances.[42]

¶ 19 Just as the record supports the entrance of summary judgment in favor of the trustee on the issue of the manner in which investments were handled, it militates against it on Verbon's claim for losses associated with the sale of mineral interests. The record reveals that the Foundation advised Verbon on October 18, 1984, and on November 9, 1984, that the mineral interests had been transferred from the trust to "general endowment" with the trust receiving $94,132.00, or $200.00 per acre, for the sale. Nevertheless, the record is devoid of any item specifically indicating that the trust—which Verbon legitimately could have presumed no longer even held title to the mineral estate—was being charged back a loss suffered by the Foundation when the minerals were sold to a private individual.

¶ 20 The only evidence the trustee proffers to support notice to Verbon that such a charge against the trust was being taken is a 1985 tax return which indicates that the trust suffered a capital loss of $23,391.47 on the sale of "land." Although the trustee implies that Verbon was forwarded a copy of the tax return, there is nothing in the record to indicate that the return was provided to him contemporaneously with its filing[43]—there is

---

"... The Foundation transferred the mineral interests from Smith's farms to the Foundation for the sum or $200 per acre for a total of $94,132...."

38. *American Nat'l Bank of Enid v. Crews,* 1942 OK 182, ¶ 21, 126 P.2d 733.

39. *Dotson v. Rainbolt,* see note 8, supra; *Mud Trans, Inc. v. Foster–Dickenson & Co.,* see note 11, supra.

40. *Digital Design Group, Inc. v. Information Builders, Inc.,* see note 10, supra; *Samuel Roberts Noble Found., Inc. v. Vick,* see note 10, supra; *Reynolds v. Porter,* see note 10, supra.

41. *Chisholm v. House,* 183 F.2d 698, 705–06 (10th Cir.1950); Restatement 2nd Trusts § 219 (1957).

42. *Holmes v. McKey,* see note 12, supra; *McNeal v. Steinberger,* 1943 OK 99, ¶ 4, 135 P.2d 490.

43. The trustee's answer brief, filed on March 6, 2002, provides in pertinent part at p. 11:

"... The same is true for the allegations made about the mineral interest transactions. The tax return provided to Verbon Smith for 1985 shows the capital loss of more than $23,000 associated with the mineral transactions. Again, this was enough information to put Verbon Smith on notice of the way the transaction was handled. Had he asked back in 1985, the transaction either was, or could have been, explained to him...."

no copy of correspondence indicating that the document was attached for mailing to Verbon and there is no other memorial of such a mailing. The only record evidence of when tax returns were received comes from the testimony of the guardian *ad litem* indicating that although the Foundation failed to produce some items of third-party verification and trust information from investment personnel she had requested, the tax returns were provided sometime after April of 1995 when she became involved in the cause.[44] Clearly, there is a question of fact concerning when Verbon may have had notice of facts sufficient to advise him that he had been harmed by the trustee's business transactions. Furthermore, nothing on the tax return indicates that the loss is associated with the sale of a mineral estate or that the loss is actually the Foundation's loss being charged back to the trust estate.

¶ 21 We are unconvinced that the bare information appearing on the 1984 tax return would have alerted Verbon that the Foundation was charging back a loss on the sale of minerals when he had previously been informed that the minerals were sold for $94,132.00. Because material issues of fact exist concerning when Verbon was provided with a tax return which may have alerted him that the trustee was charging the estate with losses associated with the sale of mineral interests and whether, when provided, the return would have advised him of the nature of the transaction resulting in the loss, we hold that summary judgment on these issues was inappropriate.

### III.

¶ 22 **WHERE THE ONLY EVIDENCE THAT THE PURCHASE OF LIFE INSURANCE POLICIES WAS CONTEMPLATED FROM THE REVENUES OF THE TRUST IS A QUOTATION FROM A DEPOSITION NOT INCLUDED IN THE RECORD, LOST INSURANCE PREMIUMS MAY NOT BE RECOVERED AS CONSEQUENTIAL DAMAGES.**

¶ 23 Verbon's guardian asserts that Verbon should be able to recover consequential damages in the nature of premiums paid for insurance on his life intended to guarantee his children an inheritance. Her theory is that the policies were cancelled or sold because the trust did not generate enough income to pay the premiums as a result of the trustee's breach of its fiduciary duty. The trustee contends that there is no basis in law or in fact for the award of insurance premiums as consequential damages.

¶ 24 Verbon's guardian's memorandum of law filed on April 26, 2001, contains quotations from the deposition of Judson Cook (Cook), the individual who first approached Verbon about the possibility of executing a trust benefitting the Convention. Those excepts contain testimony indicating that Verbon clearly expressed his concern that trust income should be sufficient to pay insurance premiums purchased to ensure his children an inheritance. Further, the quotation includes a statement by Cook that everyone expected the trust income to be adequate to pay the insurance premiums and to provide Verbon with income during his lifetime.[45]

---

44. Deposition of Cheryl Kerr, taken on February 23, 1999, providing in pertinent part:

at p. 41: "... Q After you became involved in April of '95, did the Baptist Foundation ever refuse to furnish information to you or Mr. Breeze or to the Smiths?
... A No, they didn't provide everything we asked for, but they didn't refuse...."
at pp. 63–64: "... Q Page 3 is a list of items that you requested?
A Yes.
Q Were all of those made available to you?
A No.
Q Okay.
A They provided us with the tax returns, the general ledgers, the unitrust spreadsheets...."

45. Plaintiff's Memorandum of Law, filed on April 26, 2001, providing in pertinent part at p. 3:

"... Based on Judson Cook's explanation of the arrangement, Verbon Smith expected that the trust would generate enough income to pay the insurance premiums and meet his living expenses:
[Deposition of Judson Cook, p. 33, ln. 21–p.34, ln. 3]
Q: But was it—from these discussions, was it—do you recall that it was everyone's expectation that the trust could generate sufficient income to meet these obligations, the obligations of the insurance policies and taking care of Mr. Smith for the rest of his life until death? Is that the concept that was discussed?
A: Yes, it was...."

Except for these quotations, the record is devoid of material to support the assertion that the insurance policies were purchased in conjunction with the execution of the trust document.

¶ 25 We are not free to take notice of any item not properly before the trial court.[46] Evidentiary materials in the summary judgment process must be placed into the record in compliance with Rule 13, Rules for the District Court, 12 O.S.2001, Ch. 2, App. Rule 13 requires a party opposing a motion for summary judgment to file any evidence relied upon as an attachment to the pleading in opposition.[47] All deposition material to be reviewed on appeal must be shown by the record to have been tendered for the trial court's consideration.[48]

¶ 26 There are portions of Cook's deposition testimony attached to the trustee's motion for summary judgment and brief in support. In the attached material, Cook clearly testifies that Verbon's first intent was to care for his children.[49] Additional pages of the deposition are attached to Verbon's guardian's response. However, the pages cited to in the memorandum of law indicating that Verbon communicated to the trustee that returns on investments should be sufficient to both pay insurance premiums on his life and provide for his income are missing from the record. They are not attached to the surreply brief and they are not located elsewhere in the record tendered.

¶ 27 The appellant bears the burden of presenting the appellate court with a record to support issues raised.[50] Legal error may not be presumed from a silent record.[51] Under the facts presented, where the only evidence that the purchase of life insurance policies was contemplated from the revenues of the trust is a quotation from a deposition not included in the record, we hold that lost insurance premiums may not be recovered as consequential damages.

## CONCLUSION

¶ 28 A trustee is a fiduciary of the highest order in whom the hope and confidence of the settlor are placed with the expectation that the trustee will exercise the obligations of the office for the exclusive benefit of those holding beneficial interests.[52] Without exception, a trustee owes its beneficiaries the most abundant good faith, absolute and perfect candor, openness and honesty.[53] The trustee of a charitable trust has all the same responsibilities and duties of the trustee of a private trust. These trustees are inescapably burdened with the positive

46. *Davis v. Fieker*, 1997 OK 156, ¶ 6, 952 P.2d 505; *Anderson v. Eichner*, 1994 OK 136, ¶ 6, 890 P.2d 1329; *Hulsey v. Mid–America Preferred Ins. Co.*, 1989 OK 107, ¶ 7, 777 P.2d 932.

47. Rule 13, Rules for the District Court, 12 O.S. 2001, Ch. 2, App. provides in pertinent part:
 "... b. In the statement, the adverse party or parties shall set forth and number each specific material fact which is claimed to be in controversy and reference shall be made to the pages, paragraphs, and/or lines of the depositions, admissions, answers to interrogatories and to requests for admissions, affidavits, exhibits and other material either filed by the moving party or by the adverse party, and he [sic] shall attach to the statement the portions relied upon...."
 *Anderson v. Eichner*, see note 40, supra.

48. *Anderson v. Eichner*, see note 40, supra.

49. Deposition of Judson Cook taken on September 29, 1998, providing in pertinent part at p. 11:

"... Q What do you think he wanted, what was his main purpose in doing this, as he expressed to you?
A Okay. He—his first objective was to take care of his children, and then he wanted to provide the future—have a part in providing for the future of Baptist agencies and institutions...."

50. *Jackson v. Jackson*, see note 45, infra; *Bailey v. Bailey*, 1994 OK 6, ¶ 14, 867 P.2d 1267 [Superseded by statute on other grounds.].

51. *Jackson v. Jackson*, 2002 OK 25, ¶ 12, 45 P.3d 418; *Younge v. Younge III*, 2002 OK 12, ¶ 14, 41 P.3d 966.

52. *First Nat'l Bank of Wichita Falls v. Stricklin*, 1959 OK 208, ¶ 0, 347 P.2d 652.

53. *State ex rel. Oklahoma Bar Ass'n v. Wallace*, 1998 OK 65, ¶ 0, 961 P.2d 818; *Panama Processes v. Cities Serv. Co.*, 1990 OK 66, ¶ 35, 796 P.2d 276.

responsibility of exercising prudence in trust administration and may be subject to an even higher measure of sagacity in pursuance of the integrity required by the trust relationship.[54] Certainly, where a settlor places property in trust with the same entity to which religious allegiance is pledged, the settlor should have every confidence that trust matters will be handled forthrightly.

¶ 29 In Oklahoma, charitable trusts are subject to superintendence by the appropriate district court.[55] Courts are reluctant to apply the doctrine of laches to express trusts.[56] The trend across the nation in both legislation and judicial decision continues to favor increased openness and disclosure in situations like this one where the trust is irrevocable—beneficiaries are entitled not only to accounting information but also to relevant information concerning the bases upon which the trustee's discretionary judgments have been or will be made.[57] The question of laches in the enforcement of a trust should not be disposed of by summary judgment where there is a genuine issue of material fact.[58] Nevertheless, we determine that a settlor who is advised of the nature of investments utilized and the return on those investments may not acquiesce in procedures throughout the years and preserve a cause of action.

¶ 30 The Court notes that the trustee apparently engaged in self-dealing transactions prohibited both by the trust agreement and by statute.[59] Although these actions tend to demonstrate that the trustee here has not met the high standards imposed upon charitable trustees generally, we express no opinion on whether Verbon may ultimately recover on claims associated with the handling of the sale of the mineral interests and determine that the record is insufficient to avoid summary judgment on the issue of the recovery of lost premiums as consequential damages.

## CERTIORARI PREVIOUSLY GRANTED; AFFIRMED IN PART, REVERSED IN PART; CAUSE REMANDED.

HARGRAVE, C.J., LAVENDER, KAUGER, BOUDREAU and WINCHESTER, JJ., concur.

WATT, V.C.J., concurs in part and dissents in part.

OPALA, J., dissenting:

I dissent from reviewing the certified interlocutory order; I would withdraw the earlier order that grants certiorari.

SUMMERS, J., not participating.

---

**54.** *Harrison v. Barton,* 1960 OK 256, ¶ 38, 358 P.2d 211.

**55.** Title 60 O.S.2001 § 175.23; *Wilkin v. R.H. Wilkin Trust,* 261 F.Supp. 977, 981 (W.D.Okla. 1966).

**56.** *Stephenson v. Stephenson,* 351 Mo. 8, 171 S.W.2d 565, 568 (1943). See also, *Bogert, Trusts & Trustees,* § 948 (Rev.2d ed.).

**57.** E. Halbach, "Uniform Acts, Restatements, & Trends in American Trust Law at Century's End," 88 Cal.L.Rev. 1877, 1913 (Dec.2000).

**58.** See, *Baskin v. Griffith,* 127 So.2d 467, 474 (Fla.App.1961). See also, *Wallace v. Timmons,* 232 S.C. 311, 101 S.E.2d 844, 847 (1958) [Defense of laches should not be disposed of on a demurrer where the complaint alleged some explanation of the reason for failure to attempt to enforce the trust earlier.].

**59.** See, ¶ 16, supra, and accompanying footnotes.